## JARVIS *vs.* HENWOOD.

</div>

Interlocutory mandatory injunction, to compel defendant, who was under covenant to repair, to repair a building, refused; it not appearing that the building was in danger from the alleged non-repair, and there being a dispute as to the liability, and it appearing that the lessor, who was complainant, had liberty to make the repairs himself, and had an adequate remedy at law.

On order to show cause why injunction should not issue. On bill and answer, and affidavits.

*Mr. L. Zabriskie* and *Mr. T. N. McCarter*, for complainant.

*Mr. J. Dixon*, for defendant.

THE CHANCELLOR.

The complainant moves for a preliminary injunction, substantially, to require the defendant to perform his covenant to repair certain demised premises, leased by the former to

the latter. The premises in question are a brick storehouse in Jersey City. The building is of six stories; is four hundred feet long and fifty-eight feet high. The premises were leased to be used as a tobacco warehouse, and they have been and are now used for that purpose. The complainant alleges that the defendant has so used the building that the walls have sagged or bulged to such an extent that the building is in imminent danger of falling. He also complains that the defendant has neglected the gutters and leaders on the building, and has permitted them to get out of repair, so that the water, falling on the building, is not properly carried off, but is allowed, as the complainant believes, to sap and undermine the foundation of the building. He complains also, that the iron window shutters are being damaged for the want of paint. The bill states that the defendant has refused to enter into any amicable and specific arrangement with the complainant for saving the building from sagging or settling so as to be of no use, and has rejected the complainant's proposition to that end, and has shown a reckless spirit, as if utterly regardless of his obligation in the premises. The bill prays specific performance of the covenant to repair, an account of damages sustained by breach of the covenant, and an injunction to restrain the defendant from permitting the walls to sag, or to remain in the unsafe condition in which, it is alleged, they now are, and from permitting any other waste of the demised premises.

On the filing of the bill an order to show cause why an injunction should not be issued pursuant to the prayer of the bill, was granted. To this order the defendant responds by his answer, and affidavits thereto annexed. He admits the lease and the covenant to repair, but avers that the sagging complained of existed when the demise began, which was on the first of January, 1870, and long prior thereto; that it took place very soon after the building was erected, which appears to have been over ten years ago, and before the mortar in the walls had become dry; that the building is not in danger of falling, and is not unsafe; and that he has at all

times discharged his whole obligation under the covenant, and has regarded his duty as a tenant. The defendant denies that he has refused to enter into any amicable or more specific arrangement in regard to repairs to the building, or shown a reckless spirit. He admits that he refused to do what the complainant proposed, but his refusal, he alleges, was because of the unreasonableness of the demand, which was, that he should sign an agreement, binding himself, unconditionally, to do whatever John M. Dodd and John Demarest should direct in regard to the building. He says that as Dodd and Demarest were wholly in the interest of the complainant, and were not, in the defendant's judgment, very discreet advisers, he insisted that he should be allowed to call in some impartial and competent architect or builder, to consult with them, and make suggestions as to a fair and reasonable course to be adopted, but the complainant refused, and there their negotiations for amicable adjustment ended. Dodd and Demarest superintended the erection of the building when it was constructed. The former drew the plans, and all the labor was employed and materials furnished through him. The defendant says, in his answer, that when he took the lease for the premises he was assured by Dodd and Demarest and the complainant, that the building would safely hold any amount of tobacco that would go into it.

There appears to me to be no necessity for applying the remedy of a mandatory interlocutory injunction in this case. The defendant not only, in his answer, declares his readiness to do all that can reasonably be required of him under the covenant, but his counsel, on the argument, declared that the defendant would, if the complainant wished him to do so, put in, at the complainant's expense, the trusses which the architect employed by the defendant to inspect the premises, testifies would strengthen the building so as to secure its safety under the weight of any amount of tobacco that could be got into it; or would permit the complainant to put them in, himself. Besides, the evidence satisfies me that the building is not in imminent danger of falling, as stated in the bill, nor

in any danger of falling. The architect, Patrick Keely, just referred to, whose experience and standing give weight to his opinion, testifies that the building is sufficiently strong to sustain the weight now in it—sufficiently strong to be used for the purposes of a tobacco warehouse or store, and that it is certainly as strong as it has been since the lapse of two years from the time of its construction; and that, if the building were trussed, as it could be at a cost of about $1200, it would be able to carry all the tobacco that could be placed in the space within it. He adds, that he would have put these trusses in as part of the original construction of the building. Neil Campbell, a master mason, testifies that the building is as safe as it ever was, and that, in his opinion, it is strong enough for the warehousing business—the business for which it has been used ever since it was erected. William C. Whyte, also a master mason, testifies that he does not think that the building is in any danger, and that, in his judgment, it is sufficiently strong for the purposes of a warehouse, and is as strong as it has ever been since the walls were dry. David Ettling, a master carpenter, swears that he thinks the building is safe, now, for warehousing purposes—certainly as safe as it has been since two years after its erection. In addition to these opinions, there is the important fact that in April, 1873, Mr. Campbell was employed to lay a blue stone coping on the wall of the building, which coping was to project one foot over the wall, and that he then, not suspecting that the wall was out of plumb, stretched his line to lay the coping, and found that the wall was then about six or seven inches out of the plumb, and in the same situation in which it is now. The sag or bulge in the wall appears, by his testimony, not to have increased for now almost two years past. This fact is good evidence that there the imminent danger alleged in the bill does not exist. The witnesses, Keely, Campbell, Whyte, and Ettling, all express the opinion, giving their reasons therefor, that the sagging occurred when the walls of the building were green, and that it must have occurred within the first two years after the completion of the

edifice. The complainant and his witnesses, Dodd and Demarest, allege that the sagging was first discovered by them in October last. They, none of them, say that it has increased since then. The bill was not filed until more than three months after the sagging was discovered. Owen Brady, who is, and for the last ten years has been, engaged around the warehouse, testifies in his affidavit annexed to the answer, that he had never observed any sagging of the walls until his attention was called to it by the examination made by Mr. Demarest last fall. This witness was, at first, delivery clerk for the complainant, while the latter was carrying on business alone in the warehouse; afterwards he was continued in the same employment there for the firm of A. S. Jarvis & Co., which was composed of the complainant and defendant, and since then, under the latter, he has been superintendent of the labor employed about the premises. I see no reason for the application of the summary and extraordinary remedy which is invoked. There is a controversy between these parties, as to whether the defendant is bound to strengthen the walls at all. He insists that the walls were in the condition in which they now are when he leased the premises, and that his covenant to repair involves him in no liability to straighten them up, or to secure the building against the consequences of defective construction, or the deflection of its walls existing at the time when the demise to him was made. He alleges, in his answer, that he is of sufficient pecuniary responsibility to answer all damages to which he may be liable for breach of his covenant. The complainant does not allege that the defendant is not responsible. He says, in his affidavit appended to his bill, that he does not know whether the defendant is a person of sufficient means to respond to the damages that would be caused to the complainant by the falling of the building, though he fears he may not be. If the suggestion of Mr. Keely, the architect, should be adopted, the entire expense of the work necessary to be done to render the building secure under the weight of all the tobacco which its capacity could contain, would be from $1200 to $1500.

On the hearing, as before stated, the defendant's counsel declared that the defendant would permit the complainant to do that work. Indeed, there is no allegation in the bill that the defendant has ever refused to permit the complainant to do whatever he might judge or might be advised was necessary or prudent, in view of the condition of the walls. The complainant then, if the defendant refuses to strengthen the building, may himself cause the work to be done ; and if the defendant is bound under his covenant to do that work, the complainant may recover damages at law accordingly. The answer denies the alleged non-repair of the leaders and gutters, and admitting that the shutters need paint, states that the defendant has proposed, and still proposes, and intends to paint them, when the weather is suitable. No waste is alleged or apprehended, as far as appears by the bill, except in the particulars above mentioned. There is, therefore, no occasion for an injunction to prevent waste, if it be refused in regard to the matters above considered.

The motion is denied, and the order to show cause discharged, with costs.